UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Antonio G. Amador, Jr., | Civil No. 16-00600 (SRN/HB) |
| **Plaintiff,** | |
| | ORDER |
| v. | |
| U.S. Bank National Association, | |
| **Defendant.** | |

Matthew J. Schaap and Robert B. Bauer, Dougherty, Molenda, Solfest, Hills & Bauer P.A., 14985 Glazier Avenue, Suite 525, Apple Valley, MN 55124, for Plaintiff.

David A. Schooler and Ellen A. Brinkman, Briggs & Morgan, P.A., 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Before the Court is the Objection [Doc. No. 79] filed by Plaintiff Antonio G. Amador, Jr. ("Plaintiff") to the magistrate judge's text-only order of September 19, 2017 [Docket Entry. No. 78], as reflected in the Court's minutes [Doc. No. 77] and the hearing transcript [Doc. No. 85]. Plaintiff objects to the magistrate judge's denial of his Motion to Compel Discovery [Doc. No. 69]. Based on the Court's review of the parties' arguments and the record, the Court grants in part and denies in part Plaintiff's Objection.

I.  BACKGROUND

The background of this case is more fully set forth in this Court's January 19, 2017 Order ("January 19 Order") [Doc. No. 45]. Therefore, only the facts necessary to contextualize Plaintiff's instant Objection are included here. Plaintiff, who is Hispanic, was

employed by Defendant U.S. Bank as a branch manager from September of 2011 until his termination in April of 2015. (Compl. ¶¶ 7; 24; 38 [Doc. No. 1-1].) In the early months of 2016, he brought this suit, alleging that Defendant terminated his employment based on unlawful racial discrimination.[1] (*See* Compl.) Defendant, however, maintains that it terminated Plaintiff for three legitimate business reasons: (1) "improper use of his corporate credit card;" (2) "compliance concerns rooted in his use of Customer Advice Debit, or 'CAD,' slips;" and (3) "his disobedience of a directive from upper level management to cease servicing a customer after Plaintiff transferred branches" from the Midway branch to the Eagan Town Center branch. (Def.'s First Opp'n Mem. at 2 [Doc. No. 76.])

Defendant's second stated reason—Plaintiff's alleged misuse of CAD slips—has engendered a series of discovery disputes between the parties. Defendant argues that Plaintiff's "frequent use" of CAD slips—which do not require a customer's signature—to transfer money between the accounts owned by "DK," a prominent, or "Tier 1"[2] customer of Defendant, violated Defendant's standard policies and practices. (*Id.* at 3.) Defendant contends that the use of CAD slips to transfer money from a customer's account to another account also controlled by that customer presents a significant security risk, because if a customer later challenges the transfer, there is no signature by which the bank can validate the transfer. (*Id.*) Defendant maintains that it generally discourages the use of CAD slips and that employees are directed to use them primarily to correct teller error. (*Id.*) At the

---

[1] Plaintiff brought claims pursuant to the Minnesota Human Rights Act, Minn. Stat. § 363A.01, and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e. (Compl. ¶ 5.)
[2] "Tier 1" is the highest level used to categorize a customer at U.S. Bank. (Amador Aff. ¶ 14 [Doc. No. 24].)

beginning of this case, Defendant also maintained that Plaintiff was the only employee "who has ever used the Customer Advice Debits in this manner." (Tr. of April 20, 2017 Teleconference ("Apr. 20 Teleconf.") at 11 [Doc. No. 59]).

Plaintiff, however, disputes Defendant's position. He argues that other employees similarly used CAD slips, and, in fact, contends that when he began working for Defendant, he was specifically trained to use CAD slips to transfer money between the accounts of "good," or "top" customers, including those designated as Tier 1. (Amador Aff. ¶¶ 6–10; 14.) Plaintiff identifies two managers—Nate Kuehl and Logan Rogers—who allegedly trained him to use CAD slips in this manner. (*Id.* ¶ 9.)

In October of 2016, Plaintiff moved to compel production of certain CAD slips. He sought, *inter alia*, all CAD slips from Defendant's Minnesota branches for the five years preceding Plaintiff's motion, excluding CAD slips used to correct teller errors. (First Mot. Compel Discovery at 1–2 [Doc. No. 22].) The magistrate judge denied Plaintiff's request, (*see* Ct. Min. of Nov. 29, 2016 Proceedings [Doc. No. 33]), but this Court respectfully reversed in part. (*See* Jan. 19 Order [Doc. No. 45].) This Court noted that a blanket denial of Plaintiff's discovery request was error, as the court must "balance the need for the information, the importance of discovery, and Plaintiff's lack of access to it against the tremendous burden and expense to U.S. Bank." (*Id.* at 8.) Then, weighing the considerations of Federal Rule of Civil Procedure 26(b), this Court noted that "[w]hether other U.S. Bank branch managers used CAD slips under the same or similar circumstances in which Amador used them for DK is of significant importance" to both sides. (*Id.*) But, on the other hand, the Court also "appreciate[d] U.S. Bank's concerns regarding the difficulty and cost of

3

producing the discovery for a five-year period and for all U.S. Bank branches in Minnesota." (*Id.* at 8–9.) Balancing these concerns, the Court permitted some discovery of CAD slips and instructed the parties to agree on a sampling protocol to locate CAD slips unrelated to teller error, but "limited to a sample of U.S. Bank branches in Minnesota for an agreed upon two-year period between 2011 and 2015." (*Id.* at 9.)

After this Court's January 19 Order, the parties were unable to agree on the scope of discovery, and this Court held a teleconference on April 20, 2017. (*See* Apr. 20 Teleconf.) During that call, Plaintiff challenged Defendant's proposal to limit discovery to a sample of 200 customer accounts and 40 hours of work. (*Id.* at 2–9.) Plaintiff was concerned about whether 200 accounts would be an adequate sample size—given the total number of accounts at Defendant's 135 Minnesota branches—and whether 40 hours of review could produce meaningful results. (*Id.* at 3.) On the other hand, Defendant contended that whether sampling was limited to 50 accounts, or expanded to 5,000, the likelihood of finding any CAD slips used in the way Plaintiff used them was extremely low—akin to finding "a needle in a haystack." (*Id.* at 13.) Defendant reiterated its position that it did not think "we're ever going to find anything that [Plaintiff's] looking for because that's just not the way [CAD slips] are used," (*id.* at 15); "[p]eople don't use them this way; and, in fact, that's why [Plaintiff] was fired." (*Id.* at 13.)

Recognizing that sampling as initially suggested by the Court could be costly and would possibly serve only to identify the prevalence of CAD slips, and that at that point prevalence was not the primary issue, the Court suggested—and the parties agreed—that a questionnaire be utilized instead to determine if Defendant's other branch managers used

4

CAD slips similarly to Plaintiff. (*Id.* at 17–25.) The Court recognized that the heart of Plaintiff's argument was that his use of CAD slips "was a pretext for terminating him because he's Hispanic; and that other white branch managers had, although rarely, used CADs and they weren't terminated." (*Id.* at 16–17.) In other words, the "real question," was whether "whites and Hispanic branch managers [were] treated differently over the improper use of CADs." (*Id.* at 16.) This Court thus instructed the parties to send out a questionnaire to white managers working at eight different branches from 2013 to 2015 to identify whether they used CAD slips for anything other than correcting teller error. (*Id.* at 19; 21–22.)

On June 16, 2017, Defendant produced twelve completed questionnaires. (*See* Pl.'s Letter of June 29, 2017 ("Pl.'s June 29 Letter") at 1 [Doc. No. 63].) Contrary to Defendant's initial position that only Plaintiff used CAD slips to transfer money between a customer's bank accounts, the questionnaires revealed that out of the twelve managers surveyed, two used CAD slips for purposes other than correcting teller error. (*Id.*) Both managers—Nathan Kuehl and Janelle Raaen—were employed at Defendant's Southdale branch in Edina during the relevant time period, but have since been promoted. (Pl.'s Letter of Aug. 4, 2017 at 1 ("Pl.'s Aug. 4 Letter") [Doc. No. 65].) Kuehl was also a manager at the Midway Branch, (*id.*), and he allegedly trained Plaintiff on the use of CAD slips. (Tr. of Sept. 18, 2017 Mots. Hr'g ("Sept. 18 Hr'g") at 17 [Doc. No. 85].) In addition, Plaintiff also found evidence that an assistant manager employed by Defendant had used CAD slips similarly to Plaintiff, i.e., to transfer money between accounts controlled by the same customer but without that customer's signature. (Pl.'s Aug. 4 Letter at 2 (citing *U.S. Commodity Futures Trading*

*Comm'n v. U.S. Bank, N.A.*, 13-cv-2041-LRR, 2014 WL 6474183, at *11 (N.D. Iowa Nov. 19, 2014).)

The responses to the questionnaires, and the intended effect of the questionnaires in general, triggered another discovery dispute between the parties. Plaintiff sought additional discovery focused on Raaen, Kuehl, and Timmerman, and their respective use of CAD slips. (Pl.'s June 29 Letter at 2.) He argued that the questionnaires were a means to an end, "designed to narrow the focus of any discussions around further discovery," rather than the end themselves. (Pl.'s June 29 Letter at 2; Def.'s Letter of June 29, 2017 ("Def.'s June 29 Letter") at 7, ¶ 2 [Doc. No. 62].) Defendant, however, disputed Plaintiff's interpretation of this Court's January 19 Order and April 20 teleconference, stating that it believed the next step after completion of the questionnaires was "getting the summary judgment motion back on the calendar [and] not more discovery." (Def.'s June 29 Letter at 2.)

After a June 30, 2017 teleconference with the parties, the magistrate judge ordered some focused additional discovery. (*See* Ct. Min. of June 30, 2017 Proceedings [Doc. No. 64].) The magistrate judge ordered: (1) Defendant to produce the sealed exhibit and referenced documents relating to the CAD slips issued by Hope Timmerman from the litigation discussed in *U.S. Commodity*; (2) three-hour depositions of Raaen and Kuehl; and (3) the parties to meet and confer after the depositions to determine:

> (1) whether in light of the information provided during the depositions, U.S. Bank can practically search for and produce documents pertaining to CADs issued by the two branch managers for non-IMPOC/non-teller error reasons during the time period covered by the questionnaire, and (2) whether any other discovery pertaining to this issue is sought and, if so, whether agreement can be reached regarding that discovery. (*Id.*)

Plaintiffs' depositions of Kuehl and Raaen revealed important additional details of their use of CAD slips. (*See* Def.'s Letter of Aug. 4, 2017 ("Def.'s Aug. 4 Letter") [Doc. No. 66]; Pl.'s Aug. 4 Letter.) Raaen testified that while at Southdale, she used CAD slips approximately once per month for customers who were not at the branch—particularly Tier 1 customers—but that she did not recall the names of such customers. (Pl.'s Aug. 4 Letter at 1.) According to Defendant, she also indicated that she used a "know your customer protocol" whereby she "always ask[ed] for at least two questions to identify the customer, e.g., mother's maiden name and/or last transaction." (Def.'s Aug. 4 Letter at 1–2.) Raaen also testified that the Southdale branch conducts approximately 20,000 transactions per week, whereas the Midway branch only conducts 4,000 per month. (*Id.*) For his part, Kuehl testified that he used CAD slips perhaps once or twice per quarter, limited to situations where "we could not get the customer present and they were not able to use online banking." (*Id.* at 2.) Kuehl testified that he remembered at least two customers for whom he used CAD slips. (*See* Pl.'s Aug. 4 Letter.) One was a "South African customer" for whom Kuehl used CAD slips to process rent transfers while that customer was out of the country. (*Id.* at 1.) The other was "Tri-State Bobcat," a customer for whom Kuehl performed at least one CAD slip transaction. (*Id.*) According to Defendant, Raaen further testified that she did not know of a way to locate CAD slips, and Kuehl testified that there would be no way to find CAD transactions in the Defendant's system. (Def.'s Aug. 4 Letter at 2.)

Following Raaen and Kuehl's depositions and Defendant's production of the CADs completed by assistant manager Hope Timmerman, the parties reached another discovery impasse. Plaintiff sought production of CADs slips used for Tier 1 customers at Southdale,

7

as well as the CADs used for the South African customer and Tri-State Bobcat. (Pl.'s Aug. 4 Letter at 2.) Defendant opposed further discovery, arguing that Plaintiff was now in a position to "make comparisons to two white managers who used customer advice debits and who were not fired." (Def.'s Aug. 4 Letter at 2.)

Plaintiff moved to compel for a second time. (*See* Pl.'s Mot. Compel Discovery [Doc. No. 69].) Specifically, he seeks the following:

1. All customer advice debits ("CADs") not previously produced by U.S. Bank, limited to those contained in 200 randomly selected business customer accounts (randomly selected, but including all "Tier 1" accounts) at the Southdale branch in Edina, Minnesota, limited to the period from April 21, 2013 to April 21, 2015, and further limited to those CADs that did not involve correction of teller errors;

2. All CADs performed for Tri-State Bobcat; and

3. All CADs not previously produced by U.S. Bank, which were performed for any *other* customer of U.S. Bank that is identified after a reasonable inquiry by U.S. Bank, for CAD transactions at a Minnesota branch during the period from April 21, 2013 to April 21, 2015.

(*Id.*) Plaintiff also seeks attorneys' fees. (*Id.*)

In support of his motion, Plaintiff argues that: (1) this Court's January 19 order and subsequent teleconference on April 20 did not foreclose further discovery; (2) the questionnaires were intended to narrow the search and sample size of CADs that would be produced; (3) the discovery he seeks is highly relevant, particularly in light of Defendant's expected attempt to distinguish Plaintiff's use of CAD slips from that of Raaen and Kuehl.[3] (*See* Pl's Mem. Mot. Compel at 2–8 [Doc. No. 72]); Sept. 18 Hr'g.) Specifically, Plaintiff

---

[3] At some point during the case, Defendant produced the CAD slips used by Plaintiff and that Defendant claims contributed to his firing.

contends that because Defendant will argue that that Raaen and Kuehl used CAD slips differently from Plaintiff because they employed a "know your customer protocol," Plaintiff should be permitted to examine Raaen and Kuehl's CAD slips to determine whether this protocol was documented on the CAD slips themselves. (Sept. 18 Hr'g at 4–5; 16–18). Plaintiff further argues that sampling accounts at Southdale could unveil slips used not only by Raaen or Kuehl, but by others as well, including assistant managers like Timmerman. (*Id.* at 20; *see* Pl.'s Aug. 4 Letter at 2.) Finally, Plaintiff contends the CAD slips themselves indicate whether Raaen or Kuehl used them for "top" or "Tier 1" customers, and, if so, at what frequency. (Sept. 18 Hr'g at 19).

Defendant opposes Plaintiff's newest request for CAD slips primarily on the ground that producing them would result in significant, undue burden and expense to Defendant but only minimal benefit to Plaintiff. (Def.'s First Opp'n Mem. at 10.) With regard to burden and expense, Defendant asserts that its systems do not track whether a CAD is used for a specific transaction. (Def.'s First Opp'n Mem. at 9.) Accordingly, to produce CAD slips, Defendant would have to access the account of any given customer and review each and every transaction to determine if a CAD slip was used. (*Id.* at 9–10.) Defendant contends that this effort requires the review of many thousands of documents by hand. (*Id.* at 10.) With respect to the benefit to Plaintiff, Defendant maintains that the CAD slips that Plaintiff seeks "will shed little additional light" on whether Defendant treated white branch managers who use CAD slips differently than Hispanic ones. (*Id.* at 14.) According to Defendant, there is nothing that the CAD slips would show that Plaintiff has not already taken

9

discovery on, as Plaintiff has deposed several individuals familiar with CAD slips, including the two white managers who already admitted that they used CAD slips. (*Id.* at 15.)

On September 18, 2017, in a ruling from the bench, the magistrate judge denied Plaintiff's motion to compel. (*See* Sept. 18 Hr'g at 38–42.) Magistrate Judge Bowbeer reasoned that: (1) this Court had pinpointed the pertinent issue to be whether white and Hispanic branch managers were being treated differently over the improper use of CAD slips; (2) by suggesting a questionnaire, this Court abandoned the idea of sampling; (3) the questionnaire that this Court suggested in the April 2017 teleconference was not intended to be "only the first in a series of steps that would take the parties back around again to sampling or take the parties back around to conducting . . . manual search for CADs," (*id.* at 39); and (4) "the burden of searching for and producing the CADs is disproportionate to the needs of the case" because "there's only a remote possibility that the CADs in and of themselves would carry information that would be relevant to the issues here, and that is overcome by a significant margin by the burden of making that search, given the numbers of transactions, given the fact that it appears the search would have to be done essentially transaction by transaction." (*Id.* 40–41)

Plaintiff brought the present Objection to Magistrate Judge Bowbeer's denial.

## II.   DISCUSSION

A district court's review of a magistrate judge's order on a nondispositive matter, such as the underlying motion, is "extremely deferential." *Reko v. Creative Promotions, Inc.*, 70 F. Supp.2d 1005, 1007 (D. Minn. 1999); *see also United States v. Raddatz*, 447 U.S.

667, 673 (1980). The Court will reverse such a ruling only if it is clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); D. Minn. LR 72.2(a).

As to the scope of discovery, Federal Rule of Civil Procedure 26(b) provides in pertinent part:

> (1) Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Courts widely recognize that relevance is to be broadly construed, even since the recent change in the rule. *See, e.g.*, *Mallak v. Aitkin Cty.*, No. 13-cv-2119, 2016 WL 9088760, at *4–5 (D. Minn. Dec. 22, 2016); *Regents of Univ. of Minn. v. AT&T Mobility LLC*, 2016 WL 7972908, at *3 (D. Minn. Dec. 13, 2016). In addition, Rule 26(b)(1), as amended, requires that the requested information be proportional to the needs of the case, giving due consideration to the importance of the information, issues of access, and the balance between the burden of production and expense and the benefit of the information.

Respectfully, this Court finds that the magistrate judge's denial of Plaintiff's motion to compel in its entirety was in error. This Court is substantially in agreement with the magistrate judge's careful consideration and weighing of the burden of production against the likely benefit of the requested information. However, this Court finds that requiring Defendant to search for, and produce, any CAD slips contained in a limited number of

11

accounts is not disproportionate to the needs of the case. Specifically, this Court finds that the following requests should have been granted: (1) Plaintiff's request for CAD slips, not related to teller error and not previously produced by U.S. Bank, contained in all Tier 1 accounts at the Southdale branch, for the specified two-year period; and (2) his request for CAD slips performed for Tri-State Bobcat. The Court, however, upholds the magistrate judge's ruling to the extent that it denied: (1) part of Plaintiff's first request—production of CAD slips beyond those contained in Tier 1 accounts at Southdale; and (2) the third of Plaintiff's request—production of CADs "performed for any *other* customer of [Defendant] that is identified after a reasonable inquiry by [Defendant]." (Pl.'s Mot. Compel Discovery at 2.) The Court also denies Plaintiff's request for attorney's fees.

It is undoubtedly true, as the magistrate judge recognized, that of utmost relevance to this case is whether Plaintiff was treated differently than his white counterparts over the alleged misuse of CAD slips.[4] Furthermore, this Court also strongly agrees with the magistrate judge that requiring Defendant to search its accounts for CAD slips without any bounds or limitations is overly burdensome and disproportionate to the needs of the case. Thus, the Court finds that Plaintiff's request for CAD slips, properly limited to those used for a single client—Tri-State Bobcat—and only Tier 1 customers at a single branch—Southdale branch—for a limited period of time, strikes the correct balance.

---

[4] Defendant emphasizes that it fired Plaintiff for two other legitimate business reasons, not just his misuse of CAD slips. However, as the magistrate judge recognized, Plaintiff may independently attack each of those reasons, or attempt to "knock out each of the legs of the stool." (Sept. 18 Hr'g at 27.) Defendant's two additional stated reasons for firing Plaintiff cannot preclude Plaintiff from calling into question whether he was fired, even if only in part, over his alleged misuse of CAD slips.

First, though this Court did not provide explicit instructions about the steps the parties were to take following the questionnaire, it did not foreclose further discovery. In suggesting the use of a questionnaire instead of the sampling as initially contemplated by its January 19 Order, this Court was persuaded by the parties' concern that sampling all of Minnesota's 135 branches for CAD slips unrelated to teller error would be akin to finding a "needle in a haystack." The Court's reasoning was in part informed by Defendant's position that no one other than Plaintiff ever used CAD slips in the manner alleged. In other words, the Court was persuaded that sampling a small number of accounts randomly chosen out of an unknown number of accounts at 135 Minnesota branches could produce skewed and unhelpful results.

But the landscape is much different now. Contrary to Defendant's initial position, discovery has revealed that additional employees used CAD slips to transfer money between the accounts of customers who were not present at a specific branch at the time of the transaction. And what is more, some evidence suggests that the practice may not be confined to managers only, but may extend to assistant managers as well. In light of this information, the parties are no longer looking for a needle in the haystack of 135 bank branches, but are rather looking at only one branch—Southdale—with confirmed instances of CAD slip usage not related to teller error.

Furthermore, and critically important, the information sought matters greatly to both sides. Defendant argues that the CAD slips themselves have minimal probative value at this juncture. But in light of defendant's own arguments, this Court disagrees. Defendant intends to distinguish Plaintiff's use of CAD slips from that of Raaen and Kuehl based on: (1)

13

frequency of usage[5]; and (2) the white managers' alleged use of a "know your customer" protocol. Any CAD slips used for Tier 1 customers at Southdale, as well as for Tri-State Bobcat, are directly relevant to these issues. Thus, cutting off discovery at this juncture would hinder, rather than advance, the litigation. The Court understands Defendant to be preparing to file a motion for summary judgment, and believes that the requested discovery would be critical to the Court's resolution of whether genuine issues of material fact remain for trial.

With respect to the burden on Defendant, this Court is not persuaded that it greatly outweighs the importance of the information as described above. To be sure, the Court indeed recognizes that it would be burdensome for Defendant to produce CAD slips without limitations, which is why the Court initially ordered a sampling protocol. Here, however, discovery is even less burdensome than what was initially ordered by this Court, as it involves specific accounts at a single branch for a specific time period. The Court finds that the likely benefit of the requested information, as described above, is not outweighed by the burden of production.

---

[5] Defendant argues that the parties have long agreed, and that this Court has affirmed, that the use of CAD slips for non-teller error is rare, and thus discovery going to the issue of frequency or prevalence is unhelpful. (Def.'s First Opp'n Mem. at 4–6; Def.'s Second Opp'n Mem. at 8.) But Defendant also expressly argues that Raaen and Kuehl used CAD slips differently from Plaintiff *in part* because they used CAD slips less frequently, especially as compared to the overall number of transactions at the Southdale branch. (Sept. 18 Hr'g at 30–31; Def.'s Second Opp'n Mem. at 12.) Defendant may not, on one hand, oppose discovery by arguing that information regarding frequency is unhelpful, and on the other hand use frequency as a way to distinguish Plaintiff from white managers. Although frequency may not have been directly at issue before, it has become an issue by the parties' own arguments.

The Court, however, upholds the magistrate judge's denial of the remainder of Plaintiff's request. These requests are not meaningfully different from Plaintiff's original request for CAD slips and return the parties to finding a "needle in a haystack." Since there is a new focus on the Tier 1 transactions at the Southdale branch, discovery should be properly focused on the accounts there.

As to Plaintiff's request for attorneys' fees for the cost of his motion to compel, it is denied. Although Rule 37(a)(5)(A) provides that if a motion to compel is granted the court must require the opposing party to pay the movant's reasonable expenses incurred in making the motion, the rule also prohibits an award of fees under certain circumstances, including circumstances that make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A)(iii). Here, it appears that the parties have engaged in good-faith efforts to resolve this discovery dispute and no bad-faith is alleged. Under these facts, the Court finds that an award of fees is not required. Plaintiff's request for attorneys' fees is thus denied.

## III.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Plaintiff's Objection [Doc. No. 79] is **GRANTED in part** and **DENIED in part** as described herein.

Dated: November 6, 2017         s/Susan Richard Nelson
                                SUSAN RICHARD NELSON
                                United States District Judge